| | | |
|---|---|---|
| Eric M. Van Horn<br>Texas Bar No. 24051465<br>ericvanhorn@mccathernlaw.com<br>Justin N. Bryan<br>Texas Bar No. 24072006<br>jbryan@mccathernlaw.com<br>**McCATHERN, PLLC**<br>Regency Plaza<br>3710 Rawlins Street, Ste. 1600<br>Dallas, Texas 75219<br>Telephone: (214) 741-2662<br>Facsimile: (214) 741-4717<br><br>**COUNSEL FOR THE CUSTOMER CREDITORS** | Sean J. McCaffity<br>Texas Bar No. 24013122<br>smccaffity@textrial.com<br>**SOMMERMAN, MCCAFFITY & QUESADA, LLP**<br>3811 Turtle Creek Boulevard, Ste. 1400<br>Dallas, Texas 75219<br>Telephone: (214) 720-0720<br>Facsimile:  (214) 720-0184<br><br>**COUNSEL FOR THE DALLAS PROTEON TRUSTEE** | Erin J. Jones<br>Texas Bar No. 24032478<br>erin@ostrommorris.com<br>**OSTROM MORRIS PLLC**<br>6363 Woodway, Ste. 300<br>Houston, Texas 77057<br>Telephone: (713) 863-8891<br>Facsimile: (713) 863-1051<br><br>**COUNSEL FOR THE SHIRLEY JONES CREDITORS** |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | Chapter 11 |
| | § | |
| **WILLIAMS FINANCIAL GROUP, INC.,** *et. al.*[1] | § | Case No. 17-33578-11-HDH |
| | § | |
| **Debtors.** | § | (Jointly Administered) |

### JOINT (I) OBJECTIONS TO MOTION FOR SUBSTANTIVE CONSOLIDATION AND REQUEST FOR EXPEDITED HEARING; (II) OBJECTION TO PROPOSED DISCLOSURE STATEMENT

COME NOW, WTW Investment Company, Ltd; Paula Knox, as trustee of the Turnbull Marital Trust; Jeffrey L. Dworkin; Robert A. Anderson; John J. Gonzalez; Alejandro Cabrera; Mark A. Hajda; Brooks Barkley; Sarah Barkley; Andrew Williams; Brian Beck; Steven Riebel, as trustee of the Riebel Living Trust; Jennie D. Price; Renouard Investments, LLC; Paul Thompson; David N. Pederson; Todd R. Brown; Jeffrey Miller; Michael Sullivan; Lori Bowen; Phyllis K.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Williams Financial Group, Inc. (8972); WFG Management Services, Inc. (7450); WFG Investments, Inc. (7860) and WFG Advisors, LP (9863). The address for all the Debtors is 2711 N. Haskell Ave., Suite 2900, Dallas, TX 75204.

Clark; Mark E. Trivette; Tarak Patel; Thomas Keyser; Constance Lindsey; William Balzar; and Paul Garcia (the "Customer Creditors"); Robert Yaquinto, Jr., as Trustee of the Dallas Proton Liquidating Trust (the "Dallas Proton Trustee"); and Shirley Jones; Edward A. Fly; Amanda Fly; Aileen Vidaud; William Vidaud; Lynn Gibbs; Lina Faye Gibbs; Michael Edge; Sherry Edge; Robert Cooper; Dana Cooper; Robert Tyler; Donella Tyler; Trent McDaniel; James Reynolds; Leila Reynolds; and Alexander Travieso (the "Shirley Jones Creditors"), collectively with the Customer Creditors, and the Dallas Proton Trustee, the "Objecting Creditors") by and through their respective undersigned counsel, and file this, their (I) Objections (the "Objections") to the Debtors' Motion for Substantive Consolidation [Docket No. 303] (the "Motion for Substantive Consolidation"), Request for Expedited Hearing [Docket No. 304] (the "Expedited Hearing Request"), and proposed Disclosure Statement [Docket No. 276] (the "Proposed Disclosure Statement"); and (II) Emergency Motion to Continue Hearings on the Motion for Substantive Consolidation and Approval of Disclosure Statement (the "Motion to Continue") and would respectfully show as follows.

# I.
# PRELIMINARY STATEMENT

The Debtors seek the extreme relief of substantively consolidating the Debtors, their assets, and debts, on an expedited basis in order to pursue confirmation of a plan of liquidation based upon substantive consolidation that could significantly and detrimentally impact the Customer Creditors, the Dallas Proton Trustee, and similarly situated creditors of the Debtors.

The Debtors cannot satisfy the high standard necessary for this Court to find that substantive consolidation is appropriate. The reality is that there are four distinct business entities that filed bankruptcy, there are little to zero intercompany claims that exist between the entities,

and each entity appears to have separate and distinct creditor bases and asset pools. Indeed, it appears that the only significant assets belong to only one bankruptcy estate and this jointly administered bankruptcy is a cobbled together effort to give them away to other bankruptcy estates. Substantive consolidation was not meant to create inequity. Unfortunately, the Debtors appear to be using this equitable remedy as a tool to pay creditors (namely trade creditors of WFG Parent (defined below)) monies they have no legal right to receive to the direct detriment of those creditors (namely the investor tort creditors) that likely do.

Significantly, the Disclosure Statement, as filed, reveals virtually nothing about the Debtors' plans, analysis, or basis for treating all creditors across all four separate bankruptcy estates equally. It is fatally deficient and should be rejected.

## II.
## OBJECTIONS

### A. Substantive Consolidation Is Inappropriate and Should Be Rejected.

#### 1. Substantive consolidation is a highly unusual and extreme equitable remedy.

As this Court is well aware, the "Fifth Circuit has acknowledged that bankruptcy courts do have authority to order substantive consolidation," but have noted in dicta that it is "'an extreme and unusual remedy' and should be used 'sparingly.'" *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 94 (Bankr. N.D. Tex. 2017) (citing *Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Comm.*, 584 F.3d 229, 249 (5th Cir. 2009)). The Debtors cannot satisfy their burden and demonstrate either (1) that creditors dealt with all four Debtor entities as a single economic unit and did not rely on their separate identities in extending credit; (2) that the Debtors affairs are so hopelessly entangled such that consolidation would benefit all creditors; or (3) that no prejudice

to any single creditor group would occur as a result of the consolidation. *See id.* at 96-100 (analyzing two general approaches to substantive consolidation: a multi-factor approach and a harm-balancing analysis); *see also In re AugielRestivo Baking Co., Ltd.*, 860 F.2d 515, 590 (2d Cir. 1988); *In re Owens Corning*, 419 F.3d 195, 212, n.20 (3d Cir. 2005) (ordering substantive consolidation when the entities' assets and liabilities have been "hopelessly commingled."); *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982). Under any analysis or test used by the Courts, the Debtors' efforts to substantively consolidate fail.

      **2.    Substantive consolidation would directly and negatively impact the distribution available to investor tort claimant creditors, which are the vast majority of claimants in these cases.**

This case involves four debtor entities: Williams Financial Group, Inc. ("WFG Parent"), WFG Management Services, Inc. ("WFG Management"), WFG Investments, Inc. ("WFG Investments") and WFG Advisors, L.P. ("WFG Advisors"). The vast majority of claims in these four bankruptcies relate to investors that have brought either FINRA arbitrations or other investment-related tort claims against WFG Investments. To be sure, many, if not all, of these claims were filed against each entity, but there is no dispute that the broker-dealer arm of the WFG business was WFG Investments.

WFG Investments and WFG Advisors were insured under a $2.0 million Errors & Omissions insurance policy (the "E&O Policies"), which had an aggregate limit of $4.0 million. A following form excess insurance policy existed with identical coverages. As a result, a total of $8.0 million in coverage existed. WFG Investments and WFG Advisors were insureds under the policy. WFG Parent was not an insured. WFG Management was not an insured.

The E&O Policies were purchased to insure losses related to investor tort claims like those that have been filed in the bankruptcy. The E&O Policies are typical third party liability policies and the only claims those funds can be used to satisfy are claims that would be covered under the policy. In this case, the E&O Policies would cover claims related to errors or omissions in the purchase and sale of securities brought by customers or clients of WFG Investments or WFG Advisors. The Objecting Creditors are all parties that would more likely than not be covered claimants under the terms of the E&O Policies.

In the months before the Debtors filed bankruptcy, the Debtors were besieged with litigation claims brought by aggrieved investors. The Debtors were also sued in the Northern District of Texas in a declaratory judgment action brought by the insurance carriers claiming that no coverage existed due to various theories of fraud or misrepresentations made in the application process by the Debtors.

The Debtors resolved the declaratory judgment with the insurance carriers in the form of a "buy back" agreement. The "buy back" was *not* a repurchase of premiums paid; rather, it was a negotiated settlement to resolve pending coverage litigation.

As the Court is aware, the Debtors have segregated approximately $3.2 million of the funds in a separate account. The Debtors, however, have apparently allocated 75% of the proceeds to WFG Investments and 25% of the proceeds to WFG Advisors, despite the fact that the Debtors believe that WFG Advisors only has approximately $90,000 worth of valid unsecured debt. When questioned about the allocation of insurance proceeds and assets between WFG Investments and WFG Advisors, the Debtors' CRO testified as follows:

> Q. Okay. This is based on the assumption that there's only approximately $90,000 of unsecured claims against Advisors?

> A. That's correct.
>
> Q. All right. And the cash that's $849,000, what does that constitute?
>
> A. It constitutes the cash on hand we estimate at the end of the case based on that allocation [of insurance proceeds] of 75/25.
>
> Q. Okay. Does it include the house accounts?
>
> A. No.
>
> Q. Where do the house accounts fall under your analysis of assets available for distribution?
>
> A. That is money that goes to Investments. I believe that goes to Investments.
>
> Q. …So this $849,000 assumes that 25 percent of the 3.1 million settlement payment from the insurance companies is allocated to Advisors?
>
> A. That's correct.
>
> Q. Is there any – besides the insurance allocation, is there any other assets available in Advisors?
>
> A. No, I don't think so.

Patterson Dep. at 65:2-23 (excerpts attached as Exhibit A). Put simply, the Debtors believe that all of the significant assets in the four bankruptcy cases really belong to WFG Investments – house accounts being liquidated that belong to WFG Investments and the nearly 100% of investor tort claims are properly asserted against WFG Investments. Yet, the Debtors propose to take these assets and parcel them out to three independent estates to the detriment of the investor tort claimants of WFG Investments. The inequity is self-evident.

When questioned about what the effect of the Debtors' allocation[2] of insurance proceeds between WFG Investments and WFG Advisors would be, the CRO explained that it would result in the E&O Proceeds being used to pay unsecured trade debt at WFG Parent. As the CRO testified:

> Q. Okay. And the effect of that is to basically give a larger equity waterfall back from Advisors to WFG, Inc., correct?
>
> A. It has – it allocates – this basically is allocating proceeds between WFG Investments and WFG Advisors, and so it results in the Advisors' claims being paid 100 percent, and then anything else that's left goes up to the parent company, that's correct.
>
> Q. And if the parent company, the 2.2 million dollar number, that's the same as the number we just looked at, right?
>
> A. Correct.
>
> Q. And that does not include any investor tort claims?
>
> A. That's correct.
>
> Q. Based on the adjusted allocation of insurance proceeds, however, the unsecured non-tort claims receive approximately 52 percent recovery, and that is almost entirely made up of proceeds recovered as a result of the settlement with the insurance company?
>
> A. It includes the flow of funds up from Advisors up to the parent company, yes.
>
> Q. So by flowing the funds from Advisors – by putting 50 percent of the insurance money in Advisors and then flowing the excess up to the parent company, the trade creditor's recovery goes from 16 percent to 52 percent?
>
> A. That's correct.

---

[2] The Debtors "base case" for allocation is a 75/25 split of insurance proceeds between WFG Investments and WFG Advisors. The CRO has proposed an alternative analysis of a 50/50 split of insurance proceeds between WFG Investments and WFG Advisors. The testimony below is the CRO's discussion of a 50/50 split. However, even the "base case" split of 75/25 would result in insurance proceeds being used to fund unsecured trade debt to the exclusion of investor tort claimants and is, therefore, improper.

> Q. And the investor tort claimants that are included in the WFG Investment, Inc.'s base case goes from 88 percent to 66 percent on the high side and from 24 percent to 17 percent on the low side, correct?
>
> A. That's correct.

*Id.* at 68:15-69:20.

The Debtors' proposed substantive consolidation is an effort to take insurance proceeds, which should clearly be used to pay investor tort claims that were made only against WFG Investments and spread those assets across all of the estates. The CRO has **admitted** that the effect of the Plan and substantive consolidation would be to **decrease the recovery of WFG Investments' creditors by as much as 22%**. This is neither fair nor equitable and cannot support an unusual and extreme remedy like substantive consolidation. *See e.g., In the Matter of Vitek, Inc.*, 51 F.3d 530, 535 (5th Cir. 1995) (noting potential claim to proceeds to be divided among co-insureds in proportion to potential or actual liability faced by each insured).

Indeed, there is a real question as to whether the insurance proceeds that are the subject of the "buy back" are even property of any estate. In *In re Edgeworth*, 993 F.3d 51, 56 (5th Cir. 1993), the Fifth Circuit held that proceeds of a liability policy were not part of a physician's bankruptcy estate because the proceeds "truly inure to the benefit of third parties." The same is true here. Absent this bankruptcy, these E&O Policies would only be available to satisfy investor tort claims, not general unsecured or trade creditors of the Debtors. The Objecting Creditors believe a good faith basis exists to argue that the insurance proceeds should be held in a constructive trust for the benefit of investor tort claimants alone.

### 3. No intercompany claims exist that would complicate these bankruptcies and render substantive consolidation the most practical.

The Debtors have hinted that a basis for substantive consolidation is the alleged exceptional level of difficulty an alternative bankruptcy liquidation would entail because of intercompany claims that *may* exist between the companies. No such claims have been made between any of the Debtors at this time. The CRO was unable to identify any material intercompany claims that exist or could even exist between these entities:

> Q. But, sitting here today, you don't know of any intercompany charges?
>
> A. I don't know what the outcome of that would be.
>
> Q. Yeah, and none of them filed?
>
> A. None have been filed and proof of any claims.
>
> Q. And none have been scheduled, have they?
>
> A. None have been scheduled. There's a small amount that has been scheduled.
>
> Q. Okay. So other than – I think you referenced a $13,000 amount earlier, other than that, you're not aware of any significant intercompany claim that would need to be litigated?
>
> A. None that I'm aware of specifically.

*Id.* at 78:22-79:8. Any argument that intercompany claims exist is likely factually incorrect and, in any event, is purely speculative at this juncture. It is equally as likely that no claims exist or that should any such claims arise they would be resolved quickly and easily between four separate and independent bankruptcy estates.

### 4. Duplicative claims can be addressed in a standard claims objection process.

The Debtors have made much of the fact that most investor tort claimants filed identical claims in each of the four debtor bankruptcy cases as a reason for substantive consolidation. The Debtors have argued that duplicate claims exist amongst the various estates and, thus, these creditors knew they were dealing with just one big company that should be viewed as a consolidated entity. At the same time, however, the Debtors have begun to undertake an analysis to determine which claims are duplicate claims and whether they are filed against the proper entity. The Debtors have apparently not completed an analysis of which entity is the appropriate entity for the claims to have been filed against. *See* Patterson Dep. at 21 ("We have looked at it, and we haven't completed our analysis to determine which entity is the appropriate entity.").

But the fact that the Debtors are (a) undertaking an analysis to determine the correct entity for where a claim should be properly filed and (b) understand that the majority of filed claims in these cases are duplicate is strong evidence that consolidation is not appropriate. Instead, the Court should rely on the presumptive efficacy of the claims objection process to resolve the duplicate claims problem, if one even exists.

In any event, without understanding the specific nature of the claims filed against each entity, the Objecting Creditors submit that it is impossible for the Debtors to propose a substantive consolidation in good faith. Indeed, at the CRO's deposition just last week, the Debtor did not know of the 45 claims listed on WFG Advisors claims register how many overlapped or were duplicated on the WFG Investments claims register. *See id.* at 23.

**5.     There is no evidence that the Debtors' estates are inextricably intertwined.**

The Debtors kept separate books and records. WFG Parent, WFG Investments, and WFG Management filed a consolidated tax return, but kept allegedly accurate and separate books and records sufficient to maintain their corporate separateness. WFG Advisors filed a separate tax return altogether. The Debtors were not so intertwined that they could not keep separate books and report to the IRS their separate and distinct legal nature.

**B.     The Disclosure Statement Lacks Adequate Information Concerning Numerous Material Facts.**

The Objecting Creditors object to the Proposed Disclosure Statement because, among other things, it lacks adequate information – namely any numeric analyses whatsoever – that quantifies the alleged benefit of substantive consolidation or any estimate of recovery for creditors of each of the Debtors without consolidation. Further, the Proposed Disclosure Statements fails to make clear that the substantial asset of the Debtors is cash which resulted from the buyback of the E&O Policy (defined below). Other significant disclosures are likely to be needed, including (i) the background and cause for the employment of Bridgepoint Consulting and Bill Patterson as chief restructuring officer (who is the proposed liquidating trustee), which was a compromise following trial on the Customer Creditors' motion to appoint a chapter 11 trustee; (ii) the approval of the motion to compromise the claim filed by the Michael and Leslie Orr; and (iii) any estimate of the legal fees and expenses to settle, mediate, arbitrate, or adjudicate claims related to investor losses.

The liquidation analysis in the Disclosure Statement is also woefully deficient. No analysis of individual chapter 7 bankruptcies has been undertaken and the analysis that has been done assumes a consolidated chapter 7. The alternative to confirmation of a substantively consolidated

plan very well may be conversion and four individual chapter 7 bankruptcy cases. No analysis has been provided that explains that likely scenario to provide the Debtors' creditors an informed basis from which to assess the alternatives and be able to cast an informed vote.

Based on Other important disclosures are likely needed, and the Objecting Creditors reserve all rights to raise additional objections to the Proposed Disclosure Statement at, or before, any hearing to approve it.

1. The Objecting Creditors reserve the right to amend their Objections or raise further objections or issues at any hearing on the Motion to Continue and/or the Motion for Substantive Consolidation.

RESPECTFULLY SUBMITTED on this 21st day of February, 2018.

| **MCCATHERN, PLLC** | **SOMMERMAN, MCCAFFITY & QUESADA, LLP** | **OSTROM MORRIS PLLC** |
|---|---|---|
| By: */s/ Eric M. Van Horn*<br>Eric M. Van Horn<br>Texas Bar No. 24051465<br>ericvanhorn@mccathernlaw.com<br>Justin N. Bryan<br>Texas Bar No. 24072006<br>jbryan@mccathernlaw.com<br>Regency Plaza<br>3710 Rawlins, Suite 1600<br>Dallas, Texas 75219<br>Telephone: (214) 741-2662<br>Facsimile: (214) 741-4717<br>**COUNSEL FOR THE CUSTOMER CREDITORS** | By: */s/ Sean J. McCaffity*<br>Texas Bar No. 24013122<br>smccaffity@textrial.com<br>3811 Turtle Creek Boulevard, Suite 1400<br>Dallas, Texas 75219<br>Telephone: (214) 720-0720<br>Facsimile: (214) 720-0184<br>**COUNSEL FOR THE DALLAS PROTON TRUSTEE** | By: */s/ Erin J. Jones*<br>Texas Bar No. 24032478<br>erin@ostrommorris.com<br>6363 Woodway, Ste. 300<br>Houston, Texas 77057<br>Telephone: (713) 863-8891<br>Facsimile: (713) 863-1051<br>**COUNSEL FOR THE SHIRLY JONES CREDITORS** |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, on the 21st day of February 2018, he caused copies of the foregoing Notice to be served on all parties receiving electronic notice through the Court's CM/ECF System.

By: */s/ Sean J. McCaffity*
Sean J. McCaffity
